SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
PETER H. KLEE, Cal. Bar No. 111707
JACK BURNS, Cal. Bar No. 290523
501 West Broadway, 19th Floor
San Diego, California 92101-3598
Telephone:   619.338.6500
Facsimile:    619.234.3815
E mail        pklee@sheppardmullin.com
              jburns@sheppardmullin.com

Attorneys for Defendants
ALLSTATE NORTHBROOK
INDEMNITY COMPANY

# UNITED STATE DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHAR KHAN | Case No. 2:19-cv-05726-PSG-PLA |
| Plaintiff, | **ALLSTATE NORTHBROOK INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| ALLSTATE NORTHBROOK INDEMNITY COMPANY, and DOES 1 through 100, inclusive, | Judge. Philip S. Gutierrez Courtroom 6A |
| Defendants. | **Hearing date:** January 25, 2021 **Hearing time:** 1:30 p.m. |
| | Complaint Filed: April 17, 2019 Trial Date: March 2, 2021 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL BACKGROUND ..................................................................2

      A.    The Allstate insurance policy .................................................2

      B.    Plaintiff's car accident .............................................................3

      C.    Repair of plaintiff's car, and plaintiff's criticism of repair process.......3

      D.    GEICO's payment, plaintiff's demands, and Allstate's payment..........5

      E.    Evidence discovered during this lawsuit shows plaintiff
            intentionally withheld surgery records from Allstate............................9

      F.    Evidence discovered during this lawsuit confirms plaintiff
            submitted inflated billing to Allstate .....................................11

      G.    Allegations in plaintiff's complaint........................................12

      H.    Motion to amend and proposed amended complaint .........................13

      I.    Discovery reveals that plaintiff suffered no economic damages
            that can be attributed to any bad faith by Allstate................................13

III.  NONE OF PLAINTIFF'S THEORIES ARE VIABLE ................................15

      A.    The alleged untimely payment of plaintiff's $10,000 policy
            limits demand is not a breach of contract or bad faith .......................15

            1.    There is no breach of contract because Allstate paid the
                  full amount available under the policy ...............................15

            2.    The four month "delay" in paying full UIM benefits is not
                  bad faith..........................................................................16

      B.    Plaintiff's repair process theories lack merit ................................21

            1.    Allstate did not breach the policy or act in bad faith by
                  repairing plaintiff's car because the policy gives Allstate
                  the option to repair or replace ...................................21

      C.    Allstate did not breach the policy or act in bad faith by applying
            the policy's thirty-day rental car coverage provision...........................22

      D.    The repair process theories also fail because they are not in the
            complaint ...........................................................................23

      E.    The statute of limitations bars any bad faith claim based on
            plaintiff's repair process theories .......................................23

IV.    BAD FAITH ALSO FAILS BECAUSE PLAINTIFF SUFFERED NO ECONOMIC DAMAGE FROM ALLSTATE'S CONDUCT ........................24

V.    CONCLUSION .............................................................................25

ALLSTATE NORTHBROOK INDEMNITY COMPANY'S
MOTION FOR SUMMARY JUDGMENT

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

<u>Cases</u>

4

*Adams v. Allstate Ins. Co.*
    187 F. Supp. 2d 1219 (C.D. Cal. 2002) ............................................................18

5

6

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986).............................................................................................16

7

8

*Archdale v. Am. Internat. Specialty Lines Ins.*
    154 Cal. App. 4th 449 (2007)..............................................................................24

9

*Baldwin v. AAA N. California, Nevada & Utah Ins. Exch.*
    1 Cal. App. 5th 545 (2016)............................................................................22, 23

10

11

*Blake v. Aetna Life Ins. Co.*
    99 Cal. App. 3d 901 (1979).................................................................................21

12

13

*Buss v. Superior Court*
    16 Cal. 4th 35 (1997) ..........................................................................................16

14

15

*Bybee v. Bank of Am., NA*
    768 F. App'x 660 (9th Cir. 2019).......................................................................24

16

17

*Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*
    90 Cal. App. 4th 335 (2001)..........................................................................17, 18

18

19

*Chau v. Nationwide Ins. Co. of Am.*
    2017 WL 6344817 (S.D. Cal. Dec. 12, 2017).............................................16, 17

20

21

*Echlin v. PeaceHealth*
    887 F.3d 967 (9th Cir. 2018)..............................................................................24

22

23

*Fox v. Ethicon Endo-Surgery, Inc.*
    35 Cal.4th 797 (2005) .........................................................................................24

24

25

*Globe Indem. Co. v. Superior Court*
    6 Cal. App. 4th 725 (1992)..................................................................................21

26

27

*Guz v. Bechtel Nat. Inc.*
    24 Cal. 4th 317 (2000) ........................................................................................22

28

*Hammond v. Allstate Indem. Co.*
    2010 WL 11596112 (C.D. Cal. Oct. 1, 2010)................................................18, 19

*Holenda v. Infinity Select Ins. Co.*
    2014 WL 559381 (C.D. Cal. Feb. 13, 2014) ................................................16, 17

*J.B. Aguerre, Inc. v. Am. Guarantee & Liab. Ins. Co.*
    59 Cal. App. 4th 6 (1997) ...................................................................................11

*Labon v. Gov't Employees Ins. Co.*
    2000 WL 1449879 (S.D. Cal. Aug. 15, 2000) ............................................25, 26

*Levy v. State Farm Mutual Auto. Ins. Co.*
    150 Cal. App. 4th 1 (2007)..................................................................................22

*Love v. Fire Ins. Exch.*
    221 Cal. App. 3d 1136 (1990)............................................................................22

*Mason v. Allstate Ins. Co.*
    2014 WL 212245 (C.D. Cal. Jan. 6, 2014) ........................................................16

*Maxwell v. Fire Ins. Exch.*
    60 Cal. App. 4th 1446 (1998)..............................................................16, 17, 25

*Maynard v. State Farm Mut. Auto. Ins. Co.*
    499 F. Supp. 2d 1154 (C.D. Cal. 2007) .............................................................21

*McCarthy v. State Farm Mut. Ins. Co.*
    2000 U.S. Dist. LEXIS 12020 (C.D. Cal. August 4,2000)................................25

*Merritt v. Reserve Ins. Co.*
    34 Cal. App. 3d 858 (1973)................................................................................17

*Nager v. Allstate Ins. Co.*
    83 Cal. App. 4th 284 (2000)...............................................................................20

*O'Keefe v. Allstate Indem. Co.*
    953 F. Supp. 2d 1111 (S.D. Cal. 2013) .............................................................22

*Paulson v. State Farm Mut. Auto. Ins. Co.*
    867 F. Supp. 911 (C.D. Cal. 1994)....................................... 11, 16, 17, 18, 25, 26

*Peckham v. Cont'l Cas. Ins. Co.*
    895 F.2d 830 (1st Cir. 1990) ..............................................................................12

-iv-

*Rappaport-Scott v. Interinsurance Exchange of Auto. Club*
   146 Cal. App. 4th 831 (2007)...........................................................................18

*United States v. Davidson*
   2:05-cr-253, Dkt. No. 7 (E.D. Pa. May 31, 2005).................................................7

*United States v. Heidarpour*
   5:11-cr-109, Dkt. No. 60 (W.D. Okla. May 1, 2012)...........................................7

*United States v. Oldehoeft*
   2:16-cr-401, Dkt. No. 1 (D. Ariz. April 5, 2016)................................................7

*Wade v. EMCASCO*
   483 F.3d 657 (10th Cir. 2007).............................................................................12

*Waters v. United Servs. Auto. Ass'n*
   41 Cal. App. 4th 1063 (1996)..............................................................................25

*White v. Western Title Ins. Co.*
   710 P.2d 309 (Cal. 1985) (Kaus, J., concurring and dissenting) ........................11

*Yan Fang Du v. Allstate Ins. Co.*
   697 F.3d 753 (9th Cir. 2012)...............................................................................19

<u>Statutes</u>

Vehicle Code § 544............................................................................................23

Vehicle Code § 544(a) .......................................................................................23

<u>Other Authorities</u>

*A Critical Review of the Practice of Setting Up Insurance Companies
   for Bad Faith*, 32 No. 10 Ins. Litig. Rep. 299 (2010) .........................................11

Fed. R. Civ. P. 56(a) ..........................................................................................16

# I.    INTRODUCTION

The trick of failing to provide important information, and then blaming the insurer for not considering it, is a common "bad faith setup"—i.e., the maneuvering of an insurance company to delay payment so the delay can later be labeled as bad faith.  This case has all the hallmarks of a bad faith setup.

Plaintiff Ashar Khan was in an accident while driving his parents' car, which was insured by Allstate with $25,000 in underinsured motorist (UIM) coverage.  After recovering $15,000 from the at fault driver, plaintiff demanded that Allstate pay him the $10,000 in remaining UIM coverage (offset by the $15,000 paid by the other insurer).  The medical information provided with plaintiff's demand, however, verified nothing other than minor soft tissue injuries that would not justify payment of the remaining $10,000 UIM limit.  Thus, Allstate did not accept the demand.

Unbeknownst to Allstate, plaintiff had in fact undergone a shoulder surgery.  Even though plaintiff's attorney had medical records showing that the surgery was scheduled and knew the surgery had occurred, he withheld the records from Allstate for several months.  When plaintiff's counsel finally disclosed the surgery records, Allstate immediately tendered the $10,000 UIM limit.  In other words, plaintiff received everything he demanded—and everything that Allstate even potentially owed under the policy—just a few months after plaintiff made his demand, and just days after he finally revealed information suggesting policy limits might be due.  Full payment was not enough, though.  Even after Allstate paid plaintiff's demand, plaintiff continued to demand more under the theory that Allstate had fallen into his bad faith trap.  When Allstate did not capitulate, plaintiff sued Allstate for breach of contract and bad faith based on the theory that Allstate should have paid the policy limit before plaintiff revealed the true nature of his injuries and treatment.

After Allstate removed to federal court, expediency led this case to a new turn.  Plaintiff moved to amend his complaint to add several diversity-destroying defendants.  In the process, plaintiff interjected new theories linked to the non-

-1-

diverse defendants.  Pertinent here, plaintiff challenged Allstate's decision to repair, rather than replace, his car.  And plaintiff challenged Allstate's enforcement of the policy's thirty-day rental car coverage limit.  While the Court denied plaintiff's motion to add diversity-destroying defendants, plaintiff has contended in discovery that these new car repair process theories, too, support his breach of contract and bad faith causes of action against Allstate.

Under settled California law, none of plaintiff's theories has merit.  Indeed, they all fail for several overlapping reasons.  Most notably:

- There is no breach of contract when, as here, the insurer pays the insured the limits of liability under the policy;

- Courts evaluate bad faith based on the information known to the insurer at the time of the challenged action—not based on information that plaintiff or his counsel failed to disclose throughout the claim;

- A party cannot escape summary judgment based on theories that not included in the operative complaint;

- Plaintiff did not raise his repair process theories in this case until after the two-year statute of limitations for bad faith had run;

- Proof of "substantial" economic damages is a threshold requirement for any bad faith claim, and plaintiff sustained no economic damage as a result of Allstate's conduct.

Plaintiff's maneuvering has forced Allstate (and the Court) to devote significant resources to plaintiff's claims.  There is no reason to allow this meritless case to consume even more time.  The Court should grant summary judgment, and finally put this case to an end.

## II.   FACTUAL BACKGROUND

### A.   The Allstate insurance policy

Plaintiff is a "listed driver" in the Allstate insurance policy of his parents, Mohammad and Farzana Khan.  Misuraca Dec., ¶ 2, **Ex. 1** (Allstate Policy) at 3.

-2-

The policy includes four provisions relevant to this motion:

*First*, UIM insurance for bodily injury is limited to $25,000 for each person. *Id.* at 7, 29, 30.  The $25,000 per person coverage amount is reduced by "all amounts paid by the owner or operator of the underinsured motor vehicle or the insurer of the owner or operator."  *Id.* at 30.

*Second*, the policy gives Allstate the right to determine the reasonable and necessary amount of any bill:  "If the insured person incurs medical expenses which we deem to be unreasonable or unnecessary, we may refuse to pay those expenses and contest them."  *Id.* at 25.

*Third*, it is Allstate's choice whether to repair or replace a damaged vehicle. The Allstate policy states:  "Allstate may pay for the loss in money, or may repair or replace the damaged or stolen property at our option."  *Id.* at 35.

*Fourth*, rental car reimbursement is limited to "a maximum of 30 days."  *Id.* at 7.  The policy specifically states that rental coverage will end before the completion of repairs, if repairs take longer than thirty days.  *Id.* at 33, 45.

**B.     Plaintiff's car accident**

In early March 2018, plaintiff was in a car accident while driving a Ford Mustang.  Dkt. No. 1-2 (Complaint) ¶ 11.  The other driver was insured by GEICO, which ultimately accepted fault for the accident.  *Id.* ¶ 13.  When plaintiff reported the accident to Allstate, he represented that he had suffered "no injuries" from the accident.  Misuraca Dec., ¶ 3.  Shortly after the accident, Allstate sent a letter to plaintiff explaining his thirty-day rental car coverage.  Rayburn Dec., ¶ 11, **Ex. 2**.

**C.     Repair of plaintiff's car, and plaintiff's criticism of repair process**

After the accident, plaintiff chose to take his car to Ford Auto Body, and signed a contract with the shop related to the repair of his car.  Morris Dec., ¶ 4, **Ex. 3**; **Ex. 4**; Rayburn Dec., ¶ 5.  The record shows that Allstate promptly assessed the car's damages, and worked with Ford Auto Body to evaluate and approve appropriate repair estimates and supplements.  Morris Dec., ¶¶ 5-9, **Ex. 5**; Rayburn

-3-

Dec., ¶¶ 2-8.  Within three business days after the accident, Allstate conducted an inspection of the car and determined it was repairable.  Rayburn Dec., ¶ 3.  It also ran a market valuation report, which valued plaintiff's vehicle at $24,752.48.  *Id.*, ¶ 4; **Ex. 6**.  Later, Ford Auto Body dissembled the car, and discovered that although the damage was to the car's fender, repairing the damage would also require a full replacement of the roof.  Morris Dec., ¶ 6; Rayburn Dec., ¶ 6.  Allstate promptly sent an adjuster to Ford Auto Body's shop, and within four business days, approved the new work revealed by the inspection.  *Id.*  A month later, in mid-April 2018, Ford Auto Body identified more items associated with replacing the car's roof that it had not included in its initial estimate.  Morris Dec., ¶ 7; Rayburn Dec., ¶ 7. Allstate again responded promptly:  an Allstate adjuster inspected the vehicle just three days later, and four business days after that, an adjuster conducted a second inspection and approved the costs associated with the new work.  Morris Dec., ¶ 7. Thus, every time the ball was in Allstate's court, its adjusters moved swiftly to keep repairs moving forward.  Indeed, Ford Auto Body agrees that Allstate responded in accordance with industry standards.  *Id.* ¶ 8.  Ford Auto Body explains that certain parts that it needed were on backorder, which may have extended the time Ford Auto Body needed to repair the car, but the availability of parts to the body shop plaintiff chose is not within the control of Allstate.  *Id.*, ¶ 9.  In total, Allstate and GEICO paid $18,090.94 for the repairs to plaintiff's car.  Rayburn Dec., ¶ 9.

Even so, in mid-May 2018, plaintiff wrote an email to Stuart Guerrero with Allstate, Ford Auto Body, and his counsel.  *Id.*, ¶ 10; **Ex. 7**.  In the letter he:  (1) criticized Allstate for deciding to repair his car, rather than replacing it; and (2) complained that it would take Ford Auto Body two more months to repair his car, but Allstate would not extend the rental car coverage beyond the time provided in the policy.  *Id.*  Later in the month, Allstate wrote to plaintiff and confirmed that the policy's rental car coverage was limited to 30 days and this contractual limitation would not be modified.  Rayburn Dec., ¶ 12.

-4-

**D.     GEICO's payment, plaintiff's demands, and Allstate's payment**

On October 25, 2018, GEICO paid plaintiff its bodily injury policy limit of $15,000.  Misuraca Dec., ¶ 4; **Ex. 8** at 152.  A series of demand letters to Allstate followed.[1]

In late October 2018, plaintiff's counsel sent Allstate the **first demand** in this case.  Misuraca Dec., ¶ 4; **Ex. 8**.  It demanded the remaining $10,000 UIM policy limits, after accounting for the $15,000 GEICO payment.  *Id.* at 89.  It also requested a "release and settlement documents" for plaintiff's counsel's review.  *Id.* The letter referenced additional billings from Reseda Clinic, but included no materials from that clinic.  *Id*. at 88.  The demand letter did not mention arbitration. It did not mention any concern about Allstate's decision to repair the vehicle or rental car coverage limits.  And it did not state that plaintiff needed surgery.  In fact, far from stating that plaintiff *needed* surgery, a medical record included with the demand represented that plaintiff was merely a "*candidate* for left shoulder arthroscopy."  *Id*. at 115 (emphasis added).  And the record reflected that even this speculative *candidacy* was subject to further assessment; just a few lines later the record stated, "[i]n order for us to better assess and treat, we request an MRI of the left shoulder with arthrogram."  *Id.*

Allstate evaluated the records provided with this first demand, and based on the customary charges for the services described in the bills plaintiff's counsel had provided, determined that the claim was not even worth the $15,000 that GEICO had paid.  Misuraca Dec., ¶ 4.  However, in an effort to determine whether there was support for a policy limit settlement, Allstate asked plaintiff's counsel for the records missing from the first demand several times in November and early December 2018.  *See, e.g.*, Misuraca Dec., ¶ 4; **Ex. 9**.

---

[1]  While these demand letters include plaintiff's medical records, plaintiff previously filed the same medical records on the public docket.  Dkt. Nos. 23-5, 23-7.  Allstate therefore does not file them under seal.

ALLSTATE NORTHBROOK INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT

In late December 2018, plaintiff's counsel sent Allstate the **second demand**. Misuraca Dec., ¶ 5; **Ex. 10**. The letter again did not state that plaintiff needed surgery, or mention replacement or rental coverage. *Id.* In fact, it did not even state a demand amount. *Id.* The letter stated: "If I do not hear from you or if no resolution is achieved in this matter by JANUARY 7, 2019, this demand shall be considered withdrawn and we ask that you refer this to counsel immediately for arbitration." *Id.* at 159. The second demand again requested a "release and settlement documents" for plaintiff's counsel's review. *Id.* at 161.

Allstate evaluated the damages listed in the second demand letter. Based on the materials plaintiff's counsel provided:

- The X-rays and MRIs on plaintiff's left shoulder revealed "mild" and degenerative changes, "no labral tear," and "no rotator cuff tear." *Id.* at 169, 176, 220.

- Plaintiff's chiropractic treatment was sporadic and inconsistent, beginning a week after the accident, and containing a one-month gap in treatment. *Id.* at 163-64.

Moreover, the medical bills submitted with the second demand were excessive, included duplicative billing, and were at rates above those Allstate considers normal or appropriate. For example, for every single one of plaintiff's visits to Sports Orthopedic & Spine Group/Dr. Maher Khan, the provider billed for the absolute highest-level billing codes available for extended office visits (99205 for initial visit, and 99215 for later visits). Misuraca Dec., ¶ 5; **Ex. 10** at 195, 201, 207, 214. Then, on top of that, for each visit the provider also billed a "prolonged" visit code (99354). *Id.* And then, on top of that, for each visit the provider also billed for self-care home management training (97535) and range of motion testing (95851)— codes that are only billable as "separate procedures" and "generally included in a more comprehensive procedure" such as office visits under 99205 or 99215. *Id.* But nothing in the records reflected that the highest-level office visit was necessary,

much less that the visits warranted separate billing for a prolonged visit or for training and testing generally included in the office visit codes.  Misuraca Dec., ¶ 7.[2]

All told, DecisionPoint—a computerized program used to evaluate medical billings—evaluated the medical records at only $1,066.36 total—a small fraction of what plaintiff had received from GEICO and through Med-Pay.[3]  Misuraca Dec., ¶¶ 4-6; **Ex. 11**.  Allstate nonetheless overrode the recommendations provided by DecisionPoint.  Misuraca Dec., ¶ 11.

Allstate applied pricing above what is normal and customary, approved almost all the billings sent with the second demand letter (except for Dr. Khan's use of codes 99354, 97535, and 95851, and some chiropractic treatment provided five months after the car accident, and after plaintiff had taken a month-long break from chiropractic care), and added $9,000 in general damages.  *Id.*  Indeed, while the medical reports did not justify the charges, Allstate even overrode DecisionPoint to approve Dr. Khan's use of codes 99205 and 99215 (i.e., the most expensive office visit codes).  *Id.*  As a result of its concessions, before the demand's deadline, Allstate offered $1,000 over and above the $15,000 GEICO had paid and the $1,000 plaintiff had received from Med-Pay, for a sum of $17,000.  *Id.*, ¶ 12; **Ex. 12**.  The letter stated that the offer reflected the information available to Allstate, and "if

---

[2] Allstate is not alone in considering billings of this kind excessive.  *See United States v. Davidson*, 2:05-cr-253, Dkt. No. 7, at 17-18 (E.D. Pa. May 31, 2005) (criminal complaint based in part on "claim . . . to State Farm for . . . treatment codes 95851 and 97535, each of which is already included in treatment code 99205"); *United States v. Heidarpour*, 5:11-cr-109, Dkt. No. 60, ¶ 32 (W.D. Okla. May 1, 2012) (indictment based in part on use of code 99354 without documented need for added time); *cf. United States v. Oldehoeft*, 2:16-cr-401, Dkt. No. 1, ¶¶ 13-17, 57-59 (D. Ariz. April 5, 2016) (indictment based on use of 99205 and 99215, where lower codes warranted).

[3] DecisionPoint holds information on reasonable and customary services and costs based on diagnostic codes and standardized treatments established by the American Medical Association and surgeons' colleges.  Misuraca Dec., ¶ 4.

-7-

ALLSTATE NORTHBROOK INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT

1  there is additional information that has not been taken into consideration, please

2  forward this information for further review and evaluation." *Id.*

3      Plaintiff's counsel then sent the **third demand**, which was for $50,000—*five*

4  *times the remaining UIM limit*.  It did not state that plaintiff needed surgery, or

5  mention replacement of his car, rental coverage, or arbitration.  Misuraca Dec., ¶ 13;

6  **Ex. 13**.  In fact, it included no medical records or other medical information.

7      In another effort to resolve the claim, Allstate increased its prior offer to

8  $1,200—again well above anything warranted by the records supplied to Allstate.

9  The offer letter, sent by Misuraca, again stated, "if there is additional information

10  that has not been taken into consideration, please forward this information."

11  Misuraca Dec., ¶ 14; **Ex. 14**.

12      In mid-January 2019, plaintiff's counsel called Misuraca, and left a message

13  stating that Allstate's offer was too low, and that plaintiff would have surgery, but

14  provided no medical records to support this assertion.  In response to this

15  uncorroborated representation that Khan "would have surgery," Misuraca sent a

16  letter stating, "we are pending our insured to complete shoulder surgery."  Misuraca

17  Dec., ¶ 15; **Ex. 15**.

18      In late February 2019, plaintiff's counsel sent the **fourth demand**.  Misuraca

19  Dec., ¶ 16; **Ex. 16**.  This letter demanded $1 million—*100 times the remaining UIM*

20  *policy limit*.  *Id.* at 263.  The letter included a medical record reflecting that plaintiff

21  had had the shoulder surgery in November 2018, just after plaintiff's counsel had

22  sent the first demand.  Contrary to the X-ray and MRI records plaintiff had produced

23  until then, the surgery record stated plaintiff had a left shoulder rotator cuff tear and

24  labral tear.  *Compare* **Ex. 8** at 119 and **Ex. 10** at 215 *with* **Ex. 16** at 265.  And the

25  letter emphasized: "**<u>YOUR COMPANY OFFERED $1,200 NEW MONEY ON A</u>**

26  **<u>SURGICAL CASE!</u>**"  Misuraca Dec., ¶ 16; **Ex. 16** at 261.

27      Before plaintiff's fourth demand, the medical information Allstate had

28  revealed only that plaintiff was a *potential* candidate for surgery.  The 2018 surgery

record was the first medical record Allstate received showing that a surgery had actually occurred.  Based on this new information, which showed that plaintiff's damages exceeded $25,000, Misuraca promptly called plaintiff's counsel on March 4, 2019, and offered the remaining $10,000 UIM policy limit.  Misuraca Dec., ¶ 17. Allstate also immediately sent a letter confirming its $10,000 settlement offer, and issued a $10,000 check.  *Id.*; **Ex. 17**, **Ex. 18**.  Indeed, plaintiff has acknowledged this payment in discovery.  Burns Dec., ¶ 2; **Ex. 19**, at RFAs 6, 7.  Plaintiff's counsel cashed the check later in the month.  Misuraca Dec., ¶ 17.

Despite Allstate's payment of the full policy limit, in late March 2019, plaintiff sent the **fifth demand** for $48,000.  Misuraca Dec., ¶ 18; **Ex. 20**.

**E.     Evidence discovered during this lawsuit shows plaintiff intentionally withheld surgery records from Allstate**

In discovery, Allstate requested that plaintiff produce "any demand letters" he sent to GEICO.  Burns Dec., ¶ 3; **Ex. 21**, at RFP 14.  When plaintiff responded to the request after being prompted by Allstate's motion to compel, he stated he "will produce . . . responsive documents, including . . . correspondence between Plaintiff and the interested insurance companies."  Dkt. No. 23-4 at 10.  And his production did, in fact, include some correspondence with GEICO.  Dkt. No. 23-5 at 2-12.  But plaintiff did not produce or disclose any demand letters, or do anything to indicate that he was withholding demands to GEICO.  Burns Dec., ¶ 3.  This could have led to the impression that plaintiff did not send GEICO any demands.  Allstate again pressed plaintiff to "provide all correspondence with GEICO, including demand letters."  Dkt. No. 23-6 at 8.  Plaintiff then supplemented his production to add a late-October 2018 demand letter to GEICO, but even then plaintiff failed to produce certain exhibits to the demand letter.  Dkt. No. 23-7 at 107-12 (initially produced demand letter to GEICO); Nakamura Dec., ¶ 3; **Ex. 22** (demand letter produced after

1   Allstate pointed out missing documents).[4]

2       Plaintiff's supplemented production makes clear *why* he failed to disclose his

3   full GEICO file in the first instance.  In stark contrast to the demands plaintiff sent

4   to Allstate in November and December 2018, and January 2019, plaintiff's October

5   2018 demand letter to GEICO specifically and repeatedly stressed that plaintiff's

6   surgery was not just a "potential," but in fact imminent.  **Ex. 22** at 312.  The letter

7   emphasized "**PLEASE NOTE:  CLIENT HAS BEEN SCHEDULED FOR**

8   **LEFT SHOULDER ARTHROSCOPY ON NOVEMBER 16, 2018**." *Id.*

9   (emphasis in original).  This proclamation was supported by a "surgery

10   confirmation,"   which was attached to the GEICO demand letter.  *Id.* at 370-72.

11       GEICO confirms that the surgery confirmation information that plaintiff's

12   counsel withheld from Allstate was "*critical*" to GEICO's decision to pay its

13   underlying limit of $15,000.  Nakamura Dec., ¶ 4 (emphasis added).  Indeed,

14   according to the GEICO adjuster that worked on the claim:  "If the demand letter

15   did not contain the surgery confirmation, it is likely [GEICO] would have concluded

16   that the value of Mr. Khan's claim was less than the $15,000 bodily injury policy

17   limit" in the GEICO policy.  *Id.*  Simply put, "[t]he surgery confirmation document

18   is the reason GEICO paid its $15,000 bodily injury policy limit to Mr. Khan." *Id.*

19   Plaintiff, however, never disclosed the same critical facts to Allstate until late-

20   February 2019, at which time Allstate immediately paid plaintiff's policy limits.

21       Why would plaintiff's counsel withhold evidence that plaintiff had surgery

22   until months after the surgery was completed?  Why would he repeatedly fail to

23   produce documents revealing what he knew about plaintiff's surgery, and when he

24   knew it?  "The ability of an insured to create a tort lawsuit out of a good faith denial

25   of insurance coverage creates settlement value for the plaintiff out of proportion to

---

26

27   [4] These types of discovery tactics have become a defining characteristic of this case.

28   In fact, Judge Abrams observed that plaintiff and his counsel have engaged in "repeated" and "seemingly deliberate" abuses during discovery.  Dkt. No. 31 at 5.

1   the merits of the underlying contract dispute." *Paulson v. State Farm Mut. Auto.*

2   *Ins. Co.*, 867 F. Supp. 911, 914 (C.D. Cal. 1994).  Thus, the incentive to pursue a

3   bad faith setup is that bad faith claims can be more lucrative than simply collecting

4   insurance claims.  *J.B. Aguerre, Inc. v. Am. Guar. & Liab. Ins. Co.*, 59 Cal. App. 4th

5   6, 18 (1997).  As one jurist lamented, some attorneys "are no longer interested in

6   collecting on those claims, but spend their wits and energies trying to maneuver the

7   insurers into committing acts which the insureds can later trot out as bad faith."

8   *White v. Western Title Ins. Co.*, 710 P.2d 309, 312 n.2 (Cal. 1985) (Kaus, J.,

9   concurring and dissenting).  "This technique is often combined with a time-limited

10   settlement demand," like those in the demand letters here, and as here, is "prevalent

11   in the context of medical records."  *A Critical Review of the Practice of Setting Up*

12   *Insurance Companies for Bad Faith*, 32 No. 10 Ins. Litig. Rep. 299 (2010).

13       But this trick comes at a detriment to insurance premiums and court dockets.

14   *Aguerre*, 59 Cal. App. 4th at 18 ("Every judgment against an insurer potentially

15   increases the amounts that other citizens must pay for their insurance premiums.").

16   Thus, "[c]ourts should not permit bad faith in the insurance milieu to become a

17   game of cat-and-mouse between claimants and insurer, letting claimants induce

18   damages that they then seek to recover."  *Peckham v. Cont'l Cas.*, 895 F.2d 830, 835

19   (1st Cir. 1990); *Wade v. EMCASCO*, 483 F.3d 657, 669 (10th Cir. 2007) (same).

20   **F.**   **Evidence discovered during this lawsuit confirms plaintiff submitted**

21       **inflated billing to Allstate**

22       In discovery, Allstate asked plaintiff for all documents and information

23   related to his medical care, and the amounts billed, paid, and owing for the care.

24   *See, e.g.*, Burns Dec., ¶ 3; **Ex. 21** at RFP Nos. 6 , 7, 10, and 11.  In response,

25   plaintiff provided "medical reports and billing statements," and asserted that he had

26   $145,737 in medical bills, but did not produce any information showing that

27   plaintiff's health insurer had paid many of plaintiff's medical bills.  *Id.*; Burns Dec.,

28   ¶ 4; **Ex. 23** at Interrogatories 11 and 12.

Allstate also specifically asked plaintiff to produce all documents which contain, describe, refer, or relate to any communications with any insurance company regarding the accident.  Burns Dec., ¶ 3; **Ex. 21** at RFP No. 17.  Plaintiff at first produced *nothing* related to his health insurer, Anthem.  Burns Dec., ¶ 3.  Indeed, only after Allstate independently subpoenaed records from Anthem after happening upon a reference to the company in a document Allstate received from another third party that plaintiff provided his *Further Amended Responses to Requests for Production, Set One*, producing a document that for the first time mentioned Anthem.  *Id*., **Ex. 21** at 305-307.

The documents Allstate received directly from Anthem show that plaintiff's physicians have accepted steep reductions off the face value of their bills as payment in full.  Hicks Dec., ¶ 5, **Ex. 25** (reducing $1,425 in billings from Dr. Kashani to $364.80, and $42,898 in billings from Dr. Khan to $2,387.96); *see also* **Exs. 26-30**.  Moreover, for the lion's share of the medical bills plaintiff has identified as related to his March 2018 car accident, the provider (Dr. Khan, who plaintiff represented he still owed $107,045.04) has elected to have his services covered through Anthem.  Khan Dec., ¶ 3.  Since Dr. Khan is "in-network" with Anthem, he cannot seek any additional sums from plaintiff.  Hicks Dec., ¶ 7.  Dr. Khan has confirmed this, explaining that consistent with his agreement with Anthem, he has not, and will not, seek payment from plaintiff.  Khan Dec., ¶¶ 5-7.  Contrary to his discovery responses, plaintiff therefore could not owe Dr. Khan any amount beyond what Anthem already paid.  This evidence from Anthem therefore reinforces the DecisionPoint assessment of plaintiff's bills, and shows that Allstate's evaluation of the bills was generous to plaintiff.

## G.   Allegations in plaintiff's complaint

In April 2019, plaintiff brought his state court lawsuit against Allstate.  Dkt. No. 1-2.  The complaint alleges that Allstate breached the insurance policy and acted in bad faith because it paid the full $10,000 in available UIM coverage four

-12-

months after plaintiff first demanded payment of that amount.  Dkt. No. 1-2, ¶¶ 1, 15-21.  According to the complaint, plaintiff's attorneys "demand[ed] the remaining $10,000 new money" available under the Allstate insurance policy, but Allstate made "nominal offers of $1,000 to $1,200 despite the positive findings and need for surgical intervention" and "attempted to settle the claim by way of Release – notwithstanding the contractual obligation that Allstate had."  Dkt. No. 1-2, ¶¶ 15-18.  Plaintiff labels this a "bad faith failure to timely pay [his] underinsured motorist claim," and asserts that it is the basis for his lawsuit.  *Id.*, ¶ 1.  The complaint does not acknowledge the $10,000 policy limits payment, that the release accompanied payment, or that plaintiff's demand letters had requested that Allstate send a release.

**H.      Motion to amend and proposed amended complaint**

In June 2020, plaintiff moved to amend the complaint to add several diversity-destroying defendants and new theories linked to the proposed new defendants.  Dkt. No. 15.  Two of the new theories mirrored the criticisms asserted in plaintiff's May 14, 2018 email to Guerrero, Ford Auto Body, and his counsel.  Rayburn Dec., ¶ 10; **Ex. 7**.  They would challenge:  Allstate's decision to repair, rather than replace, the car, Dkt. No. 15-4, ¶¶ 4, 26-28, 30, 31; and the enforcement of the Allstate policy's thirty-day rental car coverage limit despite a longer repair time, *id*., ¶¶ 4, 29, 31, 32, 33.  The Court denied plaintiff's motion to amend.  Dkt. No. 27.  While plaintiff concedes that other theories that he raised for the first time in this case in his motion for leave to amend are not properly before the Court because they are not in the operative complaint, plaintiff still contends that the two new repair process theories are a part of this case, even though they also were not raised in his complaint.  Burns Dec., ¶ 6; **Ex. 31**.

**I.      Discovery reveals that plaintiff suffered no economic damages that can be attributed to any bad faith by Allstate**

In discovery, plaintiff identified the following economic damages that he claims to have suffered as a result of Allstate's actions:

-13-

- "Medical Expenses: $145,737.00";
- "Future Medical Expenses: Discovery and investigation is continuing. Plaintiff is in the process of having his vehicle inspected for this amount";
- "Loss of Wages: $6,970.90";
- "Loss of Use: $14,600.00";
- "Property Damage: $18,179.41";
- "Diminution of Value: Discovery and investigation is continuing. Plaintiff is in the process of having his vehicle inspected for this amount";
- "Rental Receipts: $1,028.62";
- "Additional Attorney's Fees For The Underlying UIM Action: $4,250.00";
- "Additional Attorney's Costs for the underlying UIM Action: $373.52";
- "Attorney's Fees for the this Action: $118,573.50"; and
- "Additional Attorney's Costs for this Action: $10,373.52."

**Ex. 23**, at Interrogatories 11 and 12. The explanation plaintiff gave in his interrogatory responses for each of these alleged damages, however, shows that none of these alleged economic damages can be attributed to any purported bad faith conduct *by Allstate*. *Id.*

Every single medical expense relates to injuries caused *by the car accident.* **Ex. 32**. These include costs for X-rays, MRIs, and plaintiff's surgery. *Id.* As for "future medical expenses," plaintiff has not produced a single document to explain what this is. Nor has he supplemented his discovery responses to explain this area of damages. Burns Dec., ¶ 11. There is no indication that whatever future expenses this refers to will arise out of anything besides the accident (if they arise at all). *Id.*

The "lost wages" also arose out of the accident. The documents plaintiff relies on to support this form of damages show that plaintiff missed work a handful of times in 2018 due to "discomfort" caused by the accident, and to have the shoulder surgery that plaintiff claims was necessary as a result of the accident. **Ex. 33**.

Plaintiff similarly has not linked "loss of use," "diminution of value," and "rental receipts" to any bad faith actions by Allstate.  Nor can Plaintiff link the "property damage" damages to Allstate; the documents plaintiff cites to support this form of damages are receipts for the cost of repairs to his vehicle.  **Ex. 34**.  But Allstate did not cause the damage to plaintiff's vehicle, and it is undisputable that GEICO and Allstate paid for the repairs.  Rayburn Dec., ¶ 9; Morris Dec., ¶ 10.

Finally, plaintiff contends that his attorney's fees and costs are economic damages.  Burns Dec., ¶ 4; **Ex. 23** at Interrogatories 11 and 12.  But plaintiff hired his attorney, and became obligated to pay  his contingency fee, on March 22, 2018—long before he even made his claim to Allstate.  Burns Dec., ¶¶ 12, 13; **Ex. 35**; **Ex. 36**.

## III.   NONE OF PLAINTIFF'S THEORIES ARE VIABLE

Summary judgment should be granted when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Here, all of plaintiff's theories lack merit.

**A.**   **The alleged untimely payment of plaintiff's $10,000 policy limits demand is not a breach of contract or bad faith**

**1.**   **There is no breach of contract because Allstate paid the full amount available under the policy**

"An insurance policy is a contract between an insurer and an insured." *Buss v. Superior Court*, 16 Cal. 4th 35, 44 (1997).  Under California law, a breach of contract claim requires (1) the existence of a contract, (2) plaintiff's performance of his/her contractual duties, (3) defendant's breach of the contract, and (4) plaintiff's damages resulting from the breach.  *Chau v. Nationwide Ins. Co. of Am*., 2017 WL 6344817, at *4 (S.D. Cal. Dec. 12, 2017).

Under California law, there is no breach of contract where the insurer pays the insured "the limits of liability under his policy." *Paulson*, 867 F. Supp. at 917;

-15-

*see also Holenda v. Infinity Select Ins. Co.*, 2014 WL 559381, at *3 (C.D. Cal. Feb. 13, 2014) ("Under California law, *there can be no breach of contract where an insurer pays . . . the applicable policy limit*.") (emphasis added); *Mason v. Allstate Ins. Co.*, 2014 WL 212245, at *3 (C.D. Cal. Jan. 6, 2014).  This preclusion holds true even when the plaintiff alleges that the insurer improperly delayed payment. *Paulson*, 867 F. Supp. at 917 (insured could not state breach of contract claim where insurer at first denied uninsured motorist claim, but later paid policy limits after an arbitration).

  *Maxwell v. Fire Ins. Exch.*, 60 Cal. App. 4th 1446 (1998), is illustrative.  The insurers there delayed payment until after the insured filed a complaint seeking damages for breach of contract.  60 Cal. App. 4th at 1448.  Despite the insurers' delay in payment, however, the Court of Appeals affirmed the trial court's dismissal of the breach of contract action, because the insurer had paid the contractual benefits due under the policy.  *Id.* at 1449.  Similarly, in *Chau v. Nationwide Ins. Co. of Am.*, 2017 WL 6344817 (S.D. Cal. Dec. 12, 2017), the court held that even though the insurer waited until after the mediation of the plaintiff's claim to pay, the insurer's mere act of tendering policy limits to the insured was enough to extinguish the plaintiff's breach of contract cause of action.  *Id.* at *4.

  The same is true here.  The express terms of the insurance policy make clear that the Allstate policy limits for uninsured motorist coverage is $25,000.  Misuraca Dec., ¶ 2; **Ex. 1** at 7, 29, 30.  After GEICO's payment of $15,000, the available limits under the policy is $10,000.  *Id.* at 30.  And plaintiff has admitted that Allstate paid that amount.  Burns Dec., ¶ 2; **Ex. 19**, at RFAs 6, 7.  Thus, the rule set forth in *Paulson*, *Maxwell*, *Holenda*, and *Chau* precludes plaintiff's breach of contract claim because Allstate has paid "the limits of liability under his policy."  *Paulson*, 867 F. Supp. at 917.

  **2.**  **The four month "delay" in paying full UIM benefits is not bad faith**

SMRH:4840-2636-6669.10

ALLSTATE NORTHBROOK INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT

An insurer need not immediately cave to any demand to avoid a lawsuit for bad faith.  Bad faith is a serious charge that "involves something beyond breach of the contractual duty itself."  *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 345 (2001) (quotation marks omitted).  It "implies dishonesty, fraud and concealment."  *Merritt v. Reserve Ins. Co.*, 34 Cal. App. 3d 858, 876 (1973).  Thus, the "withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability."  *Chateau Chamberay*, 90 Cal. App. 4th at 346 (brackets and quotation marks omitted).

Consistent with the standard of reasonableness, courts do not use hindsight to judge an insurer's decision.  Instead, "[i]n determining whether an insurer has acted unreasonably or without proper cause, the insurer's actions and decisions must be evaluated *at the time they were made*, *given the information known to the insurer at the time*."  *Hammond v. Allstate Indem. Co.*, 2010 WL 11596112, at *1 (C.D. Cal. Oct. 1, 2010) (emphasis added).  "[T]he hindsight rule clearly bars this Court's consideration of information not known to the insurer at the time."  *Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1219, 1228 (C.D. Cal. 2002).

Finally, a disagreement is not bad faith.  An insurer's actions in delaying or denying benefits due are not unreasonable "if there was a *genuine dispute* between the insurer and the insured as to coverage or the amount of payment due."  *Rappaport-Scott v. Interinsurance Exchange of Auto. Club*, 146 Cal. App. 4th 831, 837 (2007) (emphasis added).  It is proper for a court to determine the existence of a genuine dispute on summary judgment.  *Chateau Chamberay*, 90 Cal. App. 4th at 347 ("It is equally clear that this [genuine dispute] issue may be resolved as a matter of law.").  In fact, "[i]n a case like this, where the insured has obtained the full measure of contract performance, courts should make a *threshold determination* of whether the undisputed facts support the existence of a tort cause of action."  *Paulson*, 867 F. Supp. at 914 (emphasis added).

-17-

1    Plaintiff's argument on the timing of Allstate's UIM payment is that Allstate

2  should have treated the case as one involving surgery from the time it received

3  plaintiff's first demand.  Dkt. No. 1-2, ¶¶ 15-18.  This argument is baseless given

4  the information Allstate had from the time plaintiff's counsel sent the first demand

5  letter in late October 2018 until he sent the fourth demand letter in late February

6  2019.  Until February 2019, the only medical record plaintiff produced related to

7  surgery stated plaintiff was a "candidate" for left shoulder arthroscopy, and that the

8  candidacy was subject to further assessment after an MRI.  Misuraca Dec., ¶¶ 4, 5;

9  **Ex. 8** at 115; **Ex. 10** at 213.  Allstate has since learned that, despite its many

10  requests for additional information, plaintiff and his counsel withheld information

11  that showed that plaintiff's claim was a surgical one.  Nakamura Dec., ¶ 3; **Ex. 22** at

12  312, 370-72.  But courts do not evaluate bad faith based on hindsight; what matters

13  is the information known to the insurer at the time.

14    *Hammond*, 2010 WL 11596112, is illustrative because it involved a delay

15  theory virtually identical to plaintiff's here.  As here, the plaintiff in *Hammond*

16  contended that the insurer acted in bad faith because it at first did not treat her UIM

17  claim as one involving surgery.  *Id.* at *5-6.  And as here, the plaintiff in *Hammond*

18  relied on a doctor's report sent with an early demand to argue that the insurer should

19  have known sooner that the plaintiff needed surgery.  *Id.* at *6.  The report relied on

20  in *Hammond* "stated that surgery was Hammond's *first option*."  *Id.* at *3 (emphasis

21  added).  The insurer did not pay based on this report, but it promptly paid UIM

22  policy limits as soon as the plaintiff provided her surgery report eight months later.

23  *Id.* at *4.  Based on these facts, the court found the report left a genuine dispute over

24  "whether Hammond would need surgery," and therefore granted summary judgment

25  on the bad faith cause of action.  *Id.* at *6.  The court explained that the doctor's

26  report in *Hammond* was not sufficient to establish that a surgery would be scheduled

27  or completed because it "did not explicitly recommend or schedule surgery."  *Id.* at

28  *6.

-18-

1    The same result reached in *Hammond* is warranted here.  Indeed, the report in

2    *Hammond* describing surgery as the plaintiff's "first option," went well beyond

3    anything plaintiff included in his first three demand letters to Allstate.  Thus, as in

4    *Hammond*, plaintiff did not produce any records establishing that surgery was

5    "explicitly recommend[ed] or schedule[d]" by a doctor until plaintiff's fourth

6    demand.  And it is undisputed that Allstate paid the full remaining $10,000 UIM

7    policy limits upon receiving the fourth demand.  Plaintiff's complaint that Allstate

8    should have treated his claim as requiring surgery sooner therefore fails, and does

9    not support his bad faith cause of action.  *Id.*; *see also Yan Fang Du v. Allstate Ins.*

10   *Co.*, 697 F.3d 753, 759 (9th Cir. 2012) (holding that an insurer "could not make an

11   earlier offer because [it] lacked corroborating proof of the extent of [the claimant's]

12   injuries and medical expenses," and explaining the insurer "could not base a

13   settlement offer solely on the representations of claimant and claimant's lawyer").

14   Additionally, the physician billings that plaintiff and his counsel tried to keep

15   secret establish that Allstate appropriately evaluated the incomplete set of medical

16   records plaintiff did provide with his first and second demands.  Indeed, this case

17   exemplifies the principle—articulated two decades ago—that "there are compelling

18   public policy reasons why insurers should not provide medical lien holders with a

19   blank check for automatic payment of all outstanding bills."  *Nager v. Allstate Ins.*

20   *Co.*, 83 Cal. App. 4th 284, 290-91 (2000).  As *Nager* explained, "[p]ersonal injury

21   litigation places a central focus upon medical specials, litigation-oriented medical

22   reports, and depositions and testimony by treating physicians and medical experts."

23   *Id.* at 291.  But "[s]imple economics preclude such costs from being incurred on a

24   pay-as-you-go basis."  *Id.*  Instead, "attorneys, litigants and medical providers rely

25   upon such devices as liens against anticipated judgments or settlements to secure

26   payment, and medical liens are frequently reduced during the process."  *Id.*  For this

27   reason, insurers appropriately use computerized billing programs (like

28

DecisionPoint) in determining the reasonableness of bills, and reject inflated bills. *Id.* at 292.

The Anthem records show that Dr. Khan and Dr. Kashani accept payments far below the face values of their bills as payment in full for their services. Hicks Dec., ¶¶ 5-15, **Ex. 25-30**. Since the physicians are "in-network" with Anthem, they must accept the amount Anthem will pay, they cannot bill plaintiff for the amounts Anthem would not pay, and they cannot avoid the Anthem rate by simply not billing Anthem. Hicks Dec., ¶¶ 3, 6, 7, 8, 11, 16. GEICO's evaluation was in accord. Nakamura Dec., ¶ 4. GEICO's assessment of the amount to pay on plaintiff's claim was driven by the surgical records that plaintiff's counsel withheld from Allstate. *Id.* Without the surgical records, GEICO states that it likely would not have even evaluated the case at $15,000 (let alone the $25,000 plaintiff contends Allstate should have valued the case at). *Id.* Like Anthem and GEICO, Allstate assessed the incomplete set of medical bills submitted with plaintiff's first and second demands as inflated. Indeed, Allstate went out of its way to find some basis to pay plaintiff. Allstate overrode its billing program's evaluation of plaintiff's billing records and offered many multiples of the program's assessment. Misuraca Dec., ¶ 11.

Finally, "delay while the insurer seeks information and investigates the insured's claim" does not give rise to bad faith liability. *Maynard v. State Farm Mut. Auto. Ins. Co.*, 499 F. Supp. 2d 1154, 1160 (C.D. Cal. 2007). *See also Blake v. Aetna Life Ins. Co.*, 99 Cal. App. 3d 901, 924 (1979) (insurer not obligated to pay claim "until it could find out on its own, to a measure of certainty," that benefits were owed); *Globe Indem. Co. v. Superior Court*, 6 Cal. App. 4th 725, 731 (1992) ("There can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insured"). Allstate repeatedly requested additional information from plaintiff's counsel to find coverage, and as soon as plaintiff's counsel sent it, Allstate paid the full available limits. Misuraca Dec., ¶¶ 12, 14; **Ex. 12**; **Ex. 14**. It was not bad faith for Allstate to

-20-

1   substantiate plaintiff's claim before it offered the full $10,000 UIM benefits

2   available under plaintiff's policy.  *Maynard*, 499 F. Supp. 2d at 1160.

**B.      Plaintiff's repair process theories lack merit**

4          Plaintiff's repair process theories—i.e., that Allstate should have replaced his

5   car rather than repair it, and should have covered more than the thirty-day rental car

6   coverage provided under the policy—also fail.  They lack merit, they are not

7   properly before the Court, and plaintiff cannot pursue a bad faith claim based on the

8   theories because they were not raised until after the statute of limitations on bad

9   faith had run.

**1.      Allstate did not breach the policy or act in bad faith by repairing plaintiff's car because the policy gives Allstate the option to repair or replace**

12         Plaintiff challenges Allstate's choice to repair his car.  But he ignores that the

13  Allstate policy gives Allstate the option to either *repair or replace* the car.

14  Misuraca Dec., ¶ 2; **Ex. 1** at 35, 46.  The election is Allstate's to make; not

15  plaintiff's.  *Id.*  Thus, Allstate did not breach the insurance policy when it chose to

16  repair plaintiff's car; it followed the policy according to its express terms.  Nor did it

17  act in bad faith.  In the insurance context, "there are at least two separate

18  requirements to establish breach of the implied covenant:  (1) benefits due under the

19  policy must have been withheld; and (2) the reason for withholding benefits must

20  have been unreasonable or without proper cause."  *Love v. Fire Ins. Exch.*, 221 Cal.

21  App. 3d 1136, 1151 (1990).  Since an element of bad faith is that the insurer

22  withheld benefits *due under the policy*, the implied covenant "cannot impose

23  substantive duties or limits on the contracting parties beyond those incorporated in

24  the specific terms of their agreement."  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317,

25  349-50 (2000).  And, "[w]here benefits are withheld for proper cause, such as lack

26  of coverage under the policy, there is no breach of the implied covenant."  *O'Keefe*

27  *v. Allstate Indem. Co.*, 953 F. Supp. 2d 1111, 1115 (S.D. Cal. 2013).

28

1   Consistent with this authority, California courts have repeatedly rejected
2   breach of contract and bad faith claims based on decisions to repair rather than
3   replace. *Baldwin v. AAA N. California, Nevada & Utah Ins. Exch.*, 1 Cal. App. 5th
4   545, 552 (2016) (dismissing breach of contract and bad faith claims with prejudice
5   because the policy gave the insurer a "clear right to elect to repair rather than to pay
6   the actual cash value of the vehicle."); *Levy v. State Farm Mutual Auto. Ins. Co.*,
7   150 Cal. App. 4th 1, 7-8 (2007) (affirming demurer without leave to amend and
8   holding that this same policy language did not even require insurer to repair to
9   "industry standards" cited by the insured).

10   Plaintiff appears to contend that Vehicle Code § 544 supports his argument.
11   Dkt. No. 15-4, ¶ 99.  Plaintiff is incorrect.  Section 544 defines the term "total loss
12   salvage vehicle" as the Vehicle Code uses it.  It doesn't govern whether an insurer
13   should repair or replace a vehicle.  Moreover, section 544 does not help plaintiff
14   because it only applies when the vehicle is considered "uneconomical to repair."
15   Vehicle Code § 544(a).  The market value report for plaintiff's case shows that it
16   was not uneconomical to repair.  To the contrary, it valued plaintiff's car at several
17   thousand dollars above what it ultimately cost to repair the car.  Rayburn Dec., ¶¶ 4,
18   7; **Ex. 6**.  Plaintiff's arguments about the comparative cost to repair versus replace
19   the car also ignores that much of the repairs were hidden at first, and only
20   discovered once Ford Auto Body's repair was underway.  Rayburn Dec., ¶¶ 3-7;
21   Morris Dec., ¶¶ 5-7.

22   **C.    <u>Allstate did not breach the policy or act in bad faith by applying the</u>**
23   **<u>policy's thirty-day rental car coverage provision</u>**

24   The only other intelligible repair process claim involves plaintiff's criticism
25   that Allstate would not cover more than thirty days of plaintiff's rental car coverage,
26   despite a longer repair.  This theory, however, ignores that thirty days is the full
27   limit of rental coverage provided under the Allstate policy, even where repairs take
28   longer.  Misuraca Dec., ¶ 2; **Ex. 1** at 7, 33, 45.  As with Allstate's decision to repair

-22-

the car, applying the policy's rental coverage limit was not improper, and could not support the causes of action asserted in the complaint. *Baldwin*, 1 Cal. App. 5th at 554 ("An insurance policy may exclude coverage for particular injuries or damages in certain specified circumstances while providing coverage in other circumstances."). It was not a breach of contract for Allstate to follow the contract, and it was not bad faith because Allstate did not withhold policy benefits. It simply enforced the policy's terms. Thus, this rental car coverage theory also does not support plaintiff's causes of actions.

**D.**     **The repair process theories also fail because they are not in the complaint**

When a theory is not included in the operative complaint, it cannot serve as a basis for opposing or denying summary judgment. *Bybee v. Bank of Am., NA*, 768 F. App'x 660, 662 n.2 (9th Cir. 2019) ("Moreover, that theory was not included in their fourth amended complaint and cannot, therefore, serve as a basis for resisting summary judgment." (citing *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008)). Plaintiff has acknowledged this law. Indeed, he resisted discovery into another allegation raised in his motion for leave to amend the complaint that he had wanted higher policy limits because "the Court denied leave for Plaintiff to address potential underwriting issues," and therefore "said issues are not properly subject to discovery." Burns Dec., ¶ 6. The same holds true for the repair process theories. The Court also denied leave for plaintiff to pursue those new theories. Dkt. No. 15 at 3; Dkt. No. 27. Thus, the operative complaint does not contain the repair process theories, and under Ninth Circuit law, and plaintiff's own reasoning, plaintiff cannot pursue them or use them to resist summary judgment.

**E.**     **The statute of limitations bars any bad faith claim based on plaintiff's repair process theories**

Plaintiff cannot bring a bad faith claim based on his repair process theories for another reason:  the two-year statute of limitations passed before he raised those theories for the first time in his motion for leave to amend. *Archdale v. Am.*

-23-

1  *Internat. Specialty Lines Ins.*, 154 Cal. App. 4th 449, 472 (2007).  These repair

2  process theories are the same ones plaintiff raised in his May 2018 email—sent

3  more than two years before plaintiff ever raised the theories in this case.  Rayburn

4  Dec., ¶ 10; **Ex. 7**.  Plaintiff cannot credibly contend that he had no "reason to

5  suspect" his repair process concerns more than two years before he first raised the

6  theories in his June 2020 motion to amend.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35

7  Cal.4th 797, 803 (2005); *cf. Echlin v. PeaceHealth*, 887 F.3d 967, 978 (9th Cir.

8  2018) ("[A]n amendment will not relate back where the amended complaint had to

9  include additional facts to support the new claim.").

10  ## IV.   BAD FAITH ALSO FAILS BECAUSE PLAINTIFF SUFFERED NO
11  ECONOMIC DAMAGE FROM ALLSTATE'S CONDUCT

12       Apart from the fact that Allstate acted reasonably, there is a separate reason

13  why Allstate is entitled to summary judgment on bad faith:  plaintiff sustained no

14  economic damage as a result of Allstate's conduct.

15       California law does not recognize a claim for bad faith based on emotional

16  distress alone.  *Maxwell*, 60 Cal. App. 4th at 1451.  Instead, proof of "substantial"

17  economic damages is a threshold requirement for bad faith.  *Id.*  Thus, if a plaintiff

18  cannot show economic loss attributable to the insurer's actions, he cannot maintain a

19  bad faith claim.  *Waters v. United Servs. Auto. Ass'n*, 41 Cal. App. 4th 1063, 1069

20  (1996) (although insurer unreasonably delayed payment, bad faith judgment

21  reversed because insured showed no economic loss).

22       The lost use of money caused by a delay in payment does not constitute

23  economic damages.  *Maxwell*, 60 Cal. App. 4th at 1450-52; *McCarthy v. State Farm*

24  *Mut. Ins. Co.*, 2000 U.S. Dist. LEXIS 12020, *13 (C.D. Cal. August 4,2000)

25  ("Under California law, however, 'loss of use' of insurance proceeds is not the type

26  of economic damage necessary to support a bad faith claim.").  Additionally,

27  attorney's fees do not satisfy the economic damages requirement when, as here, the

28  plaintiff hired the attorney before the alleged delay in payment.  *Labon v. Gov't*

-24-

1  *Employees Ins. Co.*, 2000 WL 1449879, at *1 (S.D. Cal. Aug. 15, 2000) ("[A]s to

2  attorney's fees, the evidence demonstrates that Labon had hired his attorney prior to

3  the filing of his claim with GEICO.  Thus, he had hired his attorney before GEICO

4  allegedly delayed in making payment on the claims.  Therefore, Labon cannot

5  demonstrate that his attorney's fees resulted from GEICO's unreasonable conduct.");

6  *see also Paulson*, 867 F. Supp. at 918 ("Paulson retained his attorney even before he

7  was informed that State Farm had decided not to pay any further compensation.

8  Thus, he has failed to establish a causal connection.").

9          None of the alleged economic damages that plaintiff has identified can

10  support a cause of action for bad faith.  *See supra* at 14-15.  First, the alleged

11  damages that plaintiff labels as "medical expenses," "future medical expenses,"

12  "loss of wages," "property damage," "loss of use," "diminution of value," and

13  "rental receipts" are not attributable to any bad faith actions by Allstate.  *Id*.  Indeed,

14  the first four are not even arguably attributable to Allstate, but to the car accident.

15  *Id*.  The next three hinge on plaintiff's incorrect theory that, despite the policy

16  language stating the opposite, Allstate needed to replace plaintiff's car and pay for

17  more than the policy's rental car coverage.  Finally, although plaintiff identifies

18  attorney's fees and costs as economic damages, he entered into the contingency

19  arrangement within a month of the accident.  Burns Dec., ¶¶ 12, 13; **Ex. 35**; **Ex.**

20  **36**.  Thus, like in *Labon* and *Paulson*, they cannot support bad faith.

21                      **V.    CONCLUSION**

22          Allstate did not breach the insurance policy, and it did not act in bad faith.

23  Plaintiff's case lacks merit.  The Court should grant summary judgment.

24  Dated:  December 8, 2020          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

25                                          By   _____
                                                      */s/ Jack Burns*

26                                                   JACK BURNS

27

28

-25-